## Fidelity-Philadelphia Trust Company et al. v. Simpson.

*Equity—Fraud—Conspiracy—Fraudulent acquisition of stock—Confidential relation—Evidence—Laches—Damages.*

1. Mere concealment of one's identity as a purchaser is not fraud in law, but when, for the purpose of deceiving the seller as to such identity, the purchaser induces a false understanding by a carefully devised set of actions and circumstances, so as to create a deliberate background of false appearances, there is just as much fraud as if actual words were uttered which were misstatements of fact, and this becomes all the more true in a case where the person charged with the fraud occupies an intimate, close and confidential relation to the person deceived.

2. A decree is properly entered against a defendant in a suit in equity where the evidence discloses a course of deception practiced by the defendant upon the plaintiffs by means of which a contract for the purchase of plaintiffs' entire holdings of the stock of a manufacturing corporation was induced through a dummy agent and so framed as to enable the defendant to carry out his secret and sole purpose of securing from plaintiffs for himself a fractional part only of their holdings, which he knew they were unwilling to sell, so that he might with his own holdings himself become the owner of a majority of the stock of the corporation and thus control it.

3. In such case, laches cannot be imputed to plaintiffs because suit was not entered for twenty-three years after the fraud had been perpetrated, if it appears that they acted with promptness after the fraud was discovered.

4. The statute of limitations was tolled by the defendant's active concealment of his perfidy.

5. Where fraud is charged, the court may consider the character of a party, as revealed in the evidence, in passing upon the good faith of his conduct.

6. False statements, to be deemed fraudulent in law, must relate to something represented as an existing fact, but a statement apparently only of intention, purpose or opinion may amount to a statement of fact, as where a person fraudulently misrepresents his intention in doing a particular act to the damage of another.

7. While a contract which is enforceable must be enforced in its entirety, yet where the forfeiture clause is the vital part of a fraudulent scheme, equity will relieve against the oppressive consequences of the enforcement of the clause, so that the vendee shall not be aided by the clause in consummating the contemplated fraud upon the vendors.

8. Where a defendant in an equity suit by fraudulent means procured a sale to himself of a portion of the stock of a corporation held by plaintiffs, so that he might with his own holdings secure control of the company, and a large amount of the stock still remains in the hands of plaintiffs, which they were forced to keep by the fraud, the loss to the plaintiffs is the difference between the value of all of the stock in their hands before the fraud was committed and the sale consummated and the sum of money they received under the contract, plus the value of the shares which were left in their hands after the fraud was committed, with interest at 6 per cent. on such difference from the date of the sale to the date of the decree.

9. Where there is sufficient, although meager, evidence for the court to determine the value of the shares remaining in the hands of the plaintiffs, the court will determine the damages, and the defendant cannot complain of the court's doing its best to fix the damages with the information which his own conduct has rendered meager. Per the Court *in banc* on exceptions.

10. *Semble.* When the frauds of the defendant (vendee) have made the fair and accurate ascertainment of damages impossible and the plaintiffs (vendors) still have all the stock they had agreed to sell in their own possession, the defendant may be compelled to take the stock and to pay its purchase price under the contract, with interest to date, less proper deductions for the stock's earnings during the interval. Per Gordon, Jr., Trial Judge.

11. Where a defendant objects to the jurisdiction of the court in an equity suit, he must do so by objection to the bill *in limine.*

Bill for accounting. C. P. No. 2, Phila. Co., Dec. T., 1926, No. 14810.

GORDON, JR., J., Feb. 11, 1928.—This is a bill in equity, brought by the trustees of the estates of Thomas Simpson, William Simpson and James Simp-

son against W. Percy Simpson, to compel the complete performance by the defendant of a contract for the sale of 5140 shares of the stock of the Eddystone Manufacturing Company, held by the trustees in their trust capacity, which contract is alleged to have been fraudulently induced by the defendant in 1903 for a fraudulent purpose; and the fraud successfully concealed until shortly before the institution of these proceedings.

Most, if not all, of the facts in the case are undisputed and are amply supported by the defendant's own testimony and the correspondence carried on by him with Frank P. Hays, Vice-President of the Colonial Trust Company, of St. Louis, Mo., one of his agents and his chief instrument in the perpetration and successful concealing of the fraud.

The fraud involved consists primarily in a course of deliberate deception practiced by the defendant upon the plaintiffs by means of which a pretended contract for the purchase of the plaintiffs' entire holdings of the Eddystone stock was induced and so framed as to enable the defendant to carry out his secret and sole purpose of securing from the plaintiffs for himself a fractional part only of their holdings, which he knew they were unwilling to sell, so that he might thus himself become the owner of a full majority of the stock of the corporation; and in leading them to believe that the fictitious and dummy purchaser, Hays, who was the defendant's agent in all the negotiations for the purchase, in good faith intended to buy, and to contract to buy, the entire block of the plaintiffs' holdings.

The only question in the case which is the subject of serious dispute between the parties is whether or not the evidence in fact and law establishes fraud. If it does, the plaintiffs are entitled to the relief which they seek; if it does not, the bill should be dismissed.

The proof of this fraud is to be found, as already indicated, in undisputed evidence—the defendant's admissions on the stand and his declarations contained in his communications with his agent Hays. This evidence establishes that a conspiracy existed between the defendant, Hays and others in the employ of the defendant to perpetrate his fraud upon the plaintiffs in the manner which shall now be described. In January, 1903, the plaintiff trust company and an uncle of the defendant, Lincoln Godfrey, now deceased, were the trustees of the estate of Thomas Simpson, William Simpson and James Simpson, and as such trustees held 5140 shares of the stock of the Eddystone Manufacturing Company out of a total issue of 10,000 shares. Of the remaining 4860 shares, the defendant and his mother, as trustees of the estate of William Simpson, Jr., the defendant's father, held 2790 shares. The defendant, in his own right, held 374 shares. Mrs. John Valentine, one of the Thomas Simpson heirs, held 173 shares in her own right, and the remaining 1523 shares, with slight exceptions, were held by other Simpson heirs. Lincoln Godfrey was President and the defendant Vice-President of the Eddystone Manufacturing Company, and they were two of the five directors. The Eddystone Company was a manufacturing corporation, and its entire output was sold through the partnership firm of William Simpson's Sons & Company, of which the defendant and his uncle, Lincoln Godfrey, were two of the three partners. While the Eddystone Company was a successful manufacturer of its merchandise, the most profitable part of the business was in the selling and marketing end, which was handled through the partnership already mentioned. It would seem from the evidence that Lincoln Godfrey was the dominating personality at this time in the conduct of the businesses of the corporation and the partnership and of the affairs of the estates of which he was a co-trustee with the trust company; and this leading position in the

affairs of the Simpson family, and particularly of the business, was due to his control, as co-trustee with the Trust Company, of a majority of the stock of the Eddystone Company. At this time, Lincoln Godfrey was planning to merge and reorganize the two interests—that of the company and that of the selling agency partnership. The defendant was opposed to such a merger and was covetous of acquiring for himself the advantages which would follow from ousting his uncle from control of the company and from eliminating the partnership as its selling agency. With these two purposes in view, he sought to obtain control of the company by securing so much only of the stock held by the trustees as would give him, when added to that which he individually owned or controlled, as co-trustee with his mother of his father's estate, the majority control of the company. He knew that ownership of a majority of the stock in a single hand gave it a special and peculiar value and that the trustees would not, under any circumstances, consent to sell a part of the stock and thus lose the control of the company, although they would be willing to sell out their entire block of holding. The defendant, therefore, cast about for ways and means of overreaching the will of the trustees and of acquiring the necessary fractional part of their holding, and finally decided that this could only be done by the careful and cunning practice of deception and false representation. Having thus decided, he set about to accomplish his purpose and first hired the services of Frank P. Hays, the Vice-President of the Colonial Trust Company, of St. Louis, as his agent. Hays's acts thereafter and his part in the transactions to be enumerated were solely and exclusively dictated by minute and meticulous instructions from his principal. Each step in Hays's negotiations with the trustees for the purchase of the stock was carefully planned by the defendant to induce the trustees to enter into a contract which the defendant never intended to perform and to lull the trustees into the mistaken belief that Hays was acting for a principal or principals other than the defendant and that they were dealing with a purchaser who had an honest intention in good faith to carry out the terms of the purchase in their entirety.

The contract thus induced and executed provided for the payment for, and delivery of, the stock in instalments, and contained a conditional proviso that, upon failure of the purchaser to take any instalments, the contract should terminate and excess payments in graduated instalments should be retained by the seller as liquidated damages for the breach. As will be pointed out hereafter, the insertion of this provision into the contract was procured by the defendant to enable him to default when the instalments secured should be sufficient to give him the control of the company he desired. It was in itself the key move in the conspiracy to overreach the trustees and was the vital part of the fraudulent methods adopted by the defendant to accomplish his purpose.

After the executed contract had been breached, it was essential to the success of the defendant's plans that his connection with the purchase should be concealed and his conduct in the matter permanently kept secret. His misrepresentations and deceptive acts did not, therefore, cease with the procuring of the execution of the contract by the trustees, and he thereafter continued to employ Hays and his other confederates in his efforts to reap the benefit of his fraud and to perpetuate it to his advantage. So successful was he in this that, by his subsequent acts of deception and trickery, he concealed his fraud from the trustees for upwards of twenty-five years, and the truth of his connection with the transaction and his practices therein were revealed only a short time before the bill in this case was filed. How the exposure of

his fraud came about will be described hereafter when the question of laches, which he raises as a bar to this proceeding, is discussed.

The nature of the defendant's fraud can probably best be shown by quotations from the voluminous correspondence he carried on with Hays during the course of his conspiracy. He was a prolific and, to say the least, an indiscreet correspondent, for in these letters he lays bare the shameless details of his scheming with a candor which is amazing, in view of the dishonorable nature of his acts.

These letters to Hays compose the greater bulk of the testimony, and it is impossible to quote them here in their entirety. They show how the defendant carefully anticipated situations in the negotiations and cunningly planned and brought about false and misleading appearances to hide his real object and to keep alive negotiations which he knew would fail if his purposes and his identity as the real buyer of the shares were known. They can only be appraised in their full significance by reading them in their entirety. Selections from those parts of them, however, in which his deceptive practices and purposes are most clearly disclosed or openly admitted will serve to indicate the nature of his fraud.

At an early stage of the conspiracy, the defendant discloses that he had anticipated trouble to his schemes from the presence of attorneys representing the trustees, for he writes to Hays, on Jan. 28, 1902 (s. c., 1903) :

> Don't think anything of their going to my lawyers as these men are my *friends*, tested through a number of years. I have kept them in the dark as to my detail plans, they only know that there is a deal on foot, and that they are to draw up, if they are called on, a paper which will not conflict with my partnership agreement. This much I felt that it was wise to tell them, knowing my men, and wishing to be protected from that quarter. The Trust Co. on their part having had this law firm and the father of the present men before them as it's attorney, they are naturally called on this case. We are all safe there.

Three days later, on Jan. 31, 1903, the agreement of sale which he wants to dupe the trustees into executing has been forwarded to him for approval, before delivery to them, and is returned to Hays in the following language:

> In first reading over this paper I feared you had not protected me from possible legal entanglements when it would be discovered who was the purchaser and that only a part of the 5200 shares were taken, but after careful study I now feel this point is protected. If however you feel there is the slightest danger from this, kindly change the wording, so that I am absolutely covered.

In the same letter he initiates the first false situation in his scheme of deception in order to mislead the trustees into believing that he is not the real purchaser of the stock:

> It might be well for you to send me a letter also, making *me* the same offer you do the Trust Co. so as to keep up appearances.
>
> I have now decided that it is wise to start the bidding at 125 instead of higher as Godfrey has had a decided set back in his consolidation scheme, the parties he banked on having given him a partial throw down. He remarked this morning that he had mentioned your coming to them (the others) as a bull move but it had failed, and he doubted whether you would ever be heard of again. In short, he also is getting ripe.

On Feb. 6, 1903, the course of deceit thus began advances a step further:

> I sent you from the down town office last evening a formal acknowledgment of your formal letter to me about our stock. This was to keep all straight. . . . Talk about heavy tragedy it is not in it in comparison to the scenes I am having every day. There is a possibility of the mills being closed down for a short time. . . . Another one of the little things that have acted against Eddystone! However, it suits our purpose to a tee and they will look a second time at our offer of 125 if the mills close.

In the same letter, the defendant tells how he has begun the work of deceiving his Uncle Lincoln and the trust company, for he says:

I enclosed in my letter to G. a copy of your final proposition. So far so good, but we must increase in the case rather than let up, and it needs but one word to kill him dead.

In a second letter of the same date (Feb. 6, 1903) he says:

I am delighted with our progress thus far. . . . I enclose a letter received by me from Godfrey after your letter to the Trust Co. had been received. From this you will see he is getting a bit scared as he is afraid Valentine will force the Trust Co. and himself into some deal and have the control of Eddystone slip away, and at the same time he cannot put much reliance upon the success of his consolidation scheme to pull him out of the hole. . . . Had a talk with Valentine this morning. He is warming up to it nicely and is going to put his lawyer (John G. Johnson) to find out what are his *powers*, or in other words, what kind of a drop he can use on the Trust Co. when he wants to use it. In fact, so far all goes well.

A letter of Feb. 9, 1903, gives a glimpse of the intimate and confidential relations which the defendant bears to his Uncle Godfrey:

Things are going along well and quietly. Godfrey, I surmise, has some ideas going through his head about consolidating W. S. S. & Co. with Bancrofts, in case he can sell Eddystone to "those St. Louis men," but soon as I hear exactly will advise you. . . . Nothing has as yet been said to me about any answer the Trust Co. is going to make to your letter.

On Feb. 11, 1903, Simpson explains to Hays the real purpose of the clause of the contract relating to the forfeiture of the excess payments as liquidated damages in the event of default:

I have carefully gone over the trust agreement between your company and myself and would suggest the changes marked in the two enclosed copies, the rest of the wording is yours except the added words, "as liquidated damages" after the $25,000 forfeit and the lower limit $125 per share, the reason for the last change I will explain below.

The following rough calculations seem to indicate that if my offer of $125 to the Trust Co. is turned down, we are in a position to easily make a higher and more attractive bid direct to Valentine for his 2100 shares. I wish you would give the matter your usual careful consideration, and outline a plan for broaching the subject to him in a way calculated to protect our interests and gain our point. With the Trust Co. plan, taking 5200 shares into consideration (and acquiring 1900), it would cost, including six months' interest, the forfeit and your commission as follows:

1900 shares @ 125 @ $292,687, average cost per share $154.00
@ 130 — $303,345, average cost per share $159.65
@ 135 — $314,002, average cost per share $165.26

Direct purchase from Valentine
2100 shares @ $132.50 — $292,162, average cost per share $139.12

This total cost includes your commission and stock only. You will note that if it becomes necessary to raise my offer per share we are in a position to bid as high as $132.50 per share to Valentine and acquire 2100 shares for about the same total outlay of money, $292,000, as our present offer to the Trust Co. @ 125 would cost for only 1900 shares. This same advantage applies proportionately as the price per share increases. In other words, it will cost us nothing extra to bid $8.50 per share more for Valentine's stock as against our present Trust Co. proposition, and the only question is to find a way of safely making the offer without arousing undesirable comment.

On Feb. 20, 1903, we see the defendant's subtle scheme progressing and the elaborate precautions he takes against discovery:

I think the time is ripe for you to have a personal interview with V. and to make him a positive offer of $125 per share for his 2100 shares, with interest at 5% on unpaid balances, payable in two years. This would put him in the position of having a customer for his particular holdings and armed as he doubtless will be with the opinions of an able and aggressive lawyer, I think he may bring pressure enough to bear on the Trust Co. to gain their consent either to accept $125 or

else compromise on something near it. If this course of action appeals to you and you have nothing better to suggest, you may write me a formal letter, such as any one could see and state you expect to be in Philadelphia some evening and invite me to call. This will give us the opportunity to discuss matters without any questions being raised. It might be well to write at the same time to the Trust Co. and V. arranging meetings for the following day. . . . P. S. Please note error in address of your last letter; perhaps you had better address me as follows to: Overbrook, Montgomery Co., Penna. It is fortunate this letter reached me.

On the 26th of the same month, in a letter to Mr. Du Bois, Vice-President of the trustee company, we see the confidence which the trustees put in the defendant and the defendant's pretended acceptance of the same:

My dear Mr. Du Bois:

I wish to acknowledge your kind note of 24th inst. enclosing a copy of proposition made to Mr. Hays, which will have my careful consideration. Thanking you for the same, believe me          Cordially yours,

The letter of March 10, 1903, vividly discloses the persistence with which Simpson pursued his object and glimpses some of the difficulties that his false pretending gives rise to:

As I was leaving the down town office just now, I received information that a meeting was on at the Trust Co. and I was wanted, but they did not catch me. Have just wired you as follows: "Saw your telegram G. I approve. G. desperate conferring now with Trust Co. writing." Your wire came in at a very opportune time this morning as G. was in a very upset and mad condition at a lot of provoking circumstances which came up, and in fact he looked desperate.

He stated: "that fellow means business the way he is following it up." It was after my conversation with him that I received the word from the Trust Co. and I shall see that I am out of their reach until late today.

On the following day (March 11, 1903), the confidence he is betraying gives him advanced information and facilitates his object:

From advices just received by me, I can inform you to be prepared to receive an offer from the Trust Co. to the following effect. . . . I would advise no action savoring of haste and I think that more care and thought are required just now than heretofore.

Conditions continue to favor our cause on all sides and I think a very panicky feeling exists at the Trust Co., which has been communicated by G. himself. In fact, it is not too much to say they are now anxious to sell for fear of the business making a poorer showing later on. Of course, I do not share their opinion, but see no reason of advising them of that fact. A word as to J. V., I would not rely on his verbal promises in this or any other matter. It is too important to deal with any but actual facts—actual transactions—in actual stocks.

When we *have* his stock we will *know* it is ours. As soon as you decide to come on, please wire me; I will confirm receipt by telegraph and then you can wire me an invitation to meet you, stating time and place.

By March 13, 1903, the intrigue has advanced to such a point that the defendant finds it advisable to employ a code in his correspondence with his agent, and at the same time he discloses the vital importance of concealing from the trustees the significance of the forfeiture clause and of leading them to believe that they are dealing with an honest man, who has an honest intention to perform the .contract:

In order to secure safety in telegraphing or writing or telephoning, please use following code:

| For Trust Co. | use — Coast | For W. P. S. | use — Silver |
|---|---|---|---|
| " L. Godfrey | " — Gold | " Hays | " — Harvest |
| " J. V. | " — Value | " Stock | " — Points |

I wish to suggest the desirability of impressing Coast and Gold with the idea that in any readjustment of our offer that the amount of money involved in each payment is the ruling factor so they may *not* imagine it is a certain limit of *points* we are after, as that would be fatal to success. This precaution is made necessary by our abandonment of Values Points in our calculations at present, although we

may find it necessary, for political reasons, to purchase Value's later on, as an independent transaction. I have been offered Value's points (yesterday), by way of preference over any *outside party.*

This proves the insincerity of Value as far as *you* are concerned, and at the same time I take it as an attempt to disclose my attitude toward the points. This offer was made after Value & Coast had an interview and the offer may have been inspired.

Your telegram received regarding getting option from Mrs. V., etc. I have wired as follows: "Disapprove getting option from V., first three payments must be based on Trust holdings only. Mailing instructions. Wait." In explanation would say I think for reasons cited above that we cannot trust Value, as he would undoubtedly go to Coast to see what kind of a deal he could make there and might let something slip, or again, provided he made the deal with *you before* you had closed with Coast, he, or some member of his family, might cause the transaction to reach Coast. As the latter are supposed to be selling you control, the purchase of an outside lot would appear unwarranted and suspicious and might indicate that you did not purpose taking up *all* their points. I wish to guard against any possible slip in these negotiations. Much anxiety has been manifested on all sides *as to whom you represent* and every move made is subjected to close scrutiny. Coast believes now you are figuring for control they alone possess, anything calculated to shake this belief would be fatal. Again, if Coast found you had acquired a block of points (and suspected nothing more), they would decide you were bound to complete your purchase in order to get control and raise their price accordingly.

On March 17, 1903, the contract is executed, funds for the first purchase under it are forwarded to Hays and the delicate nature of the negotiations is illuminated:

The proceeds [$123,000 of bonds shipped to Hays on same date] are to be used to take up the Points as per agreement with Coast in accordance with the limit of *points* placed by me. . . . This is the first opportunity I have had to express my hearty appreciation of your successful efforts in this difficult matter and to tender you my sincere thanks for your unremitting labor which has been so happily crowned.

I know perhaps better than any one else what obstacles have been overcome and it is only your due to say I was not sanguine as to results when we started in, and that I considered the undertaking well nigh hopeless, but worth trying.

The letter of March 21, 1903, is but one example of that attention to detail which kept the defendant's plotting secret for almost a quarter of a century:

I had a conversation this morning with my attorneys in reference to the name in which the points which you are about to buy for me is to be taken. They strongly advise that until the transaction, as you and I understand it, is closed, that the stock hereafter to be acquired shall be transferred by the vendors in blank, rather than be taken in the name of any one as trustee.

Their reason for so advising me, my attorneys tell me, is due to the fact that under the laws of Penna., where a point is taken in the name of any individual or corporation with the single superadded word "trustee," it is necessary for the corporation whose points is thus held to investigate the character of the trust, before permitting the transfer, in order that it may be proven to their satisfaction, and for their protection, that the fiduciary thus holding the stock has power to sell, convert and dispose of the same. . . . As you have it in your power at any time to discontinue these purchases in case I do not furnish you with the collateral, and as all liability to the Coast and Gold, as Trustees, will, under the terms of the agreement, immediately cease and determine, I trust that you will raise no objection to executing this acceptance in your corporate name without the addition of the word Trustee should you be requested so to do by the vendors. My purpose, as you know, is for this deal to become known to the vendors at the time and in such manner *only* as will be advisable for pleasant future relations between them and the writer.

The contract for the purchase of the stock has now been executed and the problem arises as to how it is to be successfully breached (letter to Hays, March 25, 1903):

Now as to our future movement, would say it is highly desirable that my personal acquisition of this stock from you shall be given a high degree of finish.

Fidelity-Philadelphia Trust Company et al. *v.* Simpson.

The present program is this: As soon as you acquire the first block of Coast's points please acknowledge same and in the same letter ask Coast for a yearly statement of the business dating from the formation of the Company to date, and state you wish to send a mill expert on to examine the plant. To secure this expert you will please write to the Boston School of Technology and engage a man competent to inspect such a plant and report to you upon its value in a general way. You will understand what he is to do when I say the object is to establish the fact that you are really interested and are sizing up the situation through your expert. Send him to Gold with a letter of introduction stating your object, etc. For this additional expense please charge to my account.

When you receive the history of the company, please write for more information, asking for a general statement of the present condition of the business. When you get this, please continue your inquiries by asking for detailed statements as to the Assets and Liabilities, etc., at such intervals of time as to bring you finally up to the end of the actual negotiation and a little beyond your final payment. Do not indulge in any open criticism but simply ply questions *that in effect will be more penetrating than mere criticisms.* The object is to enable *them* to reach a tangible and reasonable conclusion *as to why you finally quit.*

Dissatisfaction with Coast's showing—your expert reports—and a failure to carry out your general scheme of amalgamation are weighty reasons. You will thus finish this part of the program with a lot of undesirable points, which will .finally seek a market through Silver at cost and find it *only at a decided loss.* But that is "another story." I enclose clippings illustrating the accuracy of modern newspaper reports. They make interesting and instructing reading, as they indicate how the wind blows. The conclusion of your March 20th letter relative to your proposed visit and the "finishing touches" is happily put and heartily approved. The enjoyment will be mutual.

### And again, on April 2, 1903:

I have been revolving in my mind a plan for future action to be based on the following lines.

You will follow up your inquiries as arranged and should finally ascertain that the mills have shut down, which will be in about two weeks. When you ascertain this through Gold or your expert, it would be well to ask when the place will resume work, and if the shut down is reported to be indefinite, try to ascertain from Gold what conditions make it indefinite and ascertain his views as to the future prospects of the business, etc. Now having secured the number of points desired by Silver and shortly after the receipt thereof, I am considering the advisability of your asking *Gold* to make *you* a personal *bid*, for your entire contract with Coast. If he declines point blank to do so, as is probable, it is only natural that you should (but later on) offer me the same opportunity, which I too will decline.

After you have finally dropped out and paid your forfeit you can renew your offer with me to get rid of your points and do so at a loss. If Gold instead of refusing to bid begins to negotiate, you will have to hold the points high enough to be out of his reach. Do not make any counter offer. If Gold puts himself in a position of bidding to you a higher price than he obtained from Coast, the latter. and the Estates will criticize him for not obtaining that figure for them, and if he attempts to buy control at a lower price his position is not much better, and he would fear your throwing up your contract. He is mainly responsible for the sale of the points, knows it and feels it, and so does Coast, and any attempt of his to buy would look strange. Think it over and criticize. I believe that the business will be at its worst when it is time to ask him for an offer and that he will flatly refuse to bid.

There are many reasons why I should avoid an open rupture and why I should seek a way of breaking the blow. If he has the chance to buy and *wont*, it will simplify matters for                    Yours truly,

By April 7, 1903, the future and the necessity for keeping his operations secret, even after everything is finished, become increasingly apparent, and plans are laid accordingly:

Of course I am exceedingly anxious that our programme as to *silence* shall be respected absolutely by all the officials of your company even after the deal is finished so as to preserve harmony.

Fidelity-Philadelphia Trust Company et al. *v.* Simpson.

Again, on April 22, 1903, the defendant writes to Hays on the same subject:

You say in part you had instructed your Board to not mention name of client until matter was *entirely closed.* I wish to say in reference to it that as I am planning to break the news to Gold so as to avoid an open rupture if possible, that as soon as you deem it advisable to do so you will please have a plain talk with your people and show them how extremely advisable and desirable it is for them to continue the policy of silence *indefinitely.* I feared from the above portion of your letter that your Board would consider themselves at liberty to talk as soon as the matter was closed. This would never do, as it would cause an immediate rupture, which I desire to avoid for family as well as business reasons.

Direct trickery is not enough, for the restless and scheming mind of the defendant is at work, on May 5, 1903, in order to make doubly sure of the concealment of his conduct, and he conceives a false collateral situation to distract the attention of the trustees:

I have requested Gold to sell to me for personal use a small piece of land near the R. R. station at Eddystone. He has the matter under consideration, thinking I intend to move my private shop out of the yard owned by the E. Co. Now the point is this. The new plot is owned jointly by the Simpson Estates and E. Co. You will therefore have to give your consent. In a former letter I wrote of clinching Gold's belief that you meant business. This has been accomplished but a few more nails won't hurt. Your consolidation comes at the right time to tear things up by the roots explaining why you did *not* make the "Glorious 4th" payment.

By May 8, 1903, his purpose is accomplished, and this strategic excursion is abandoned in two letters, one to Hays, in which he says:

I enclose letter from Gold in reference to my proposed land purchase about which I wrote you recently. I have decided not to push the matter for political reasons, as my object has been attained by making an effort to get the shop out of your way.

and the other to Lincoln Godfrey, in which he pretends a solicitude for his uncle's interests, which is false, and distorts and misrepresents the truth:

Dear Uncle Lincoln: I wish to thank you for your letter of today which you kindly forwarded to Eddystone. From what you say I see very plainly that my request would cause considerable trouble and I now realize that we are no longer in a position to settle such matters among ourselves.

I am willing to drop the matter in view of the importance of avoiding any possible controversy with the St. Louis people for which I would not like to feel responsible. I merely wanted to get my shop out of the way to avoid possible "trouble ahead."

During this time, the main activity of the conspiracy progresses. On May 26, 1903, the defendant writes to Hays:

Gold now thinks big people are back of the enterprise with an accurate knowledge of the printing business as indicated by your line of investigation, and that an enlarged plan may be looked for, etc. Gold wants your expert's report, but not only must he be deprived of this but you will kindly request your expert to *refrain* from giving him *all* or *any part* of the information he gathers for you. Please make a point of this. I think it is now the proper time for you to call for a statement covering the entire business of the Co. during its last fiscal year and up to date. . . . Matters are moving nicely and satisfactorily and I believe I will land in a position to negotiate direct with you for the stock and cut out proposed offer of same to Gold without disturbing the serenity of present relations.

On the same day the defendant brings a little financial pressure to bear upon the trustees:

In reference to the $40,150.60 now being loaned on call by the Estate of Wm. Simpson, Jr., to the Eddystone Mfg. Co., we [defendant and his mother, Mrs. Emma Simpson] as Executors of the aforesaid Estate, desire to call said entire loan in equal sums of about $10,000, each payable to us on the 10th day of June, July, August and September. Larger payments will be acceptable.

By May 29, 1903, the time is fast approaching to execute the default in the contract for the purchase of the shares, and the defendant writes to Hays:

I would like Coast and Gold *not* to think the third payment was cut and dried. It would be well to show the 4th was well considered, therefore kindly compose a letter and submit to me soon for approval, *dated one day after* your 4th payment is due, asking "for an extension of time for 10 or 15 days." Kindly frame your letter so as not to bind yourself in any way, so that if the extension of time *is* granted you will be in shape to drop out with a well considered letter which we will compose later. Your hesitating over the 4th payment will look like a division of opinion among the investors owing to the various reports of your experts, Gold's business statements and the generally unfavorable condition of the entire cotton goods business which has gone from bad to worse since contract was signed. On the other hand, if Gold is really anxious (or becomes so) to terminate your contract he will seize the opportunity and refuse the extension of time, on technical grounds.

Thus far he has been dominated by Coast, but it remains to be seen how much he can stand, as even now he considers you "very aggressive." It would be well to clinch his opinion of you in your own inimitable way.

The last payment has been made. The default is about to occur. The stock is in the hands of Hays and the fruits of the fraud must be gathered in by its transfer, without suspicion, to the defendant. Fictitious correspondence is devised to show to the trustees and to throw dust into their eyes, and so, on June 16, 1903, the defendant attacks this immediate problem:

Now the point is this. Gold's absence gives me the most plausible and favorable opportunity to open up correspondence with you and buy the points. I propose handing him the correspondence when he returns. This will be the most direct and desirable way for me to enter the arena, in the light of events of recent occurrence. We will cut out my old proposition of giving Gold a chance to bid.

I now have in mind three important letters for you to send, one dated July 2nd to Coast (asking extension of time), the other two (one to Gold and one to Coast) ten or fifteen days later, when you give notice of your final decision. These last letters bring you up to your vacation and it would be just as well to tell Gold about the same. Any letters from Gold would doubtless have to wait your return to St. Louis. I would be indebted if you would keep in touch with me while you are away so we can act as circumstances dictate. You understand Gold's movements control me in this matter.

On June 23, 1903, the defendant thinks it will be unnecessary for his agent to come on to Philadelphia to make the pretended sale in person: "In fact, I would prefer you would not come as I wish to be in a position to make use of the correspondence, which will explain matters better than I could verbally." He wants Hays to avoid "inaccessible places" where prompt communication would be difficult and "my opportunity to shape matters would disappear." He then goes on with his painstaking instructions:

The programme is this: After you send the three letters previously arranged for, we will have reached the middle of July. Presuming Gold vacates in August, I will open up correspondence with you asking, if the points are for sale, the price, etc. I will forward in a few days a brief draft of the correspondence desired so we can be ready to mail the letters in regular order when desired.

My object in having you give your ultimatum to Gold about his selling agency was to give him no excuse for delaying the formation of his company, which he would do if he thought there was any hope of your investing. I want him to form his company if he can. It would simplify matters for me in the management of the plant to have his mind occupied elsewhere. I might add in reference to your not coming on, that I wish to avoid certain risks which we will discuss at our leisure after the ball.

In following, through the correspondence, this trail of deceit and perfidy, one cannot help but marvel at the profound and accurate insight into human nature possessed by the chief actor in the conspiracy. The uncle's character,

his manly and honorable confidence in others, are accurately appraised and taken advantage of, and nothing is omitted that ingenuity could suggest to baffle his discernment and mislead his judgment. This is shown in the letter of June 25, 1903, as follows:

Enclosed please find draft of letter to Gold, which I would like you to put in your language under date of July 13th and send it to me for approval. I expect Gold to do considerable guessing when he reads it. He may imagine he knows the absentee and he may think you are seeking a new contract at a lower figure. He may get mad at your *counting* on having a representative on the board, entrance to the works-accounts, etc., and rule you out, but he can never catch that auto or beat you at "talking back." I want him to rule out the minority by way of precedent. You will notice that your experts are only inferentially made responsible for the conclusions of your principals. I don't want Gold to attack them or be in a position to question any individuals. Gold may come back at you wanting to know your principals. It is valuable therefore to refer to the possibility of *you* being the owner, as he half suspects you now and it may ease his mind—shut him up.

The postscript to the letter of June 29, 1903, for the first time suggests a cruel satisfaction at the good augury for success that the situation now discloses:

I am afraid your vacation is being "Butchered to make a Roman holiday" but somehow I think you will enjoy the gore.

It is not yet time, however, to give oneself over to exultation, and carefully laid plans must be strengthened and brought to successful conclusion. On July 1, 1903, the plotting continues:

The following is a draft of a letter from you to me which I will ask you to rewrite in your own words and return to me at the *earliest moment* for approval:

"On the strength of certain important information regarding your financial affairs given to us, quite incidentally, by Gold, during our recent Eddystone stock option, we venture to approach you upon the following subject.

"We trust your motives will be appreciated and that you will pardon our allusions to your private affairs which are made only because necessary. Gold informed us he intended forming a new Selling Co. and personally investing capital in the same, that you would not go into the new company for certain reasons and that the present commission house terminates by limitations Dec. 31-03. As this will release your capital which we understand is a large sum, we have been moved to write to you in the hope of interesting you in a proposition regarding Eddystone stock. We have just rec'd positive news from our clients that they intend selling the block of stock recently sold to them by Coast and Gold, as they have urgent need for the money. From what we have learned, we think it would be a great mistake for you to permit this stock to be thrown on the open market for such securities, if you can possibly help it, as it would undoubtedly jeopardize Eddystone interests. Of course you may differ in opinion but we offer our opinion in good faith. I have requested our people to defer action until I could make you a proposition and this they have consented to, provided we act quickly.

"We offer you subject to prompt acceptance by mail, the entire block of stock sold to us by the Phila. Trust Co. at the actual cost to our client" (here state price per share, including a sum to cover any commission you deem advisable, and say) "with interest at the rate of 5% per annum from the date of acceptance to time of settlement, and we *personally* will agree to wait settlement until your funds in the W. S. S. & Co. are released at the end of this year. We think it is in order for us to explain that Mr. Gold's reference to your financial affairs was brought out solely through our discussion of the commission house and into which you necessarily entered and that our knowledge of your coming withdrawal from the present commission house was acquired without special inquiry on our part. We believe Mr. Gold will bear us out in this.

"Furthermore, at the time the information was given, our clients were moving toward the completion of their option. Were it not for the fact that Mr. Gold has informed us of his financial engagements we would today be making you both an offer to take this stock jointly."

(*Use* this as an *afterthought.*)

Fidelity-Philadelphia Trust Company et al. *v.* Simpson.

P. S. "Our offer covers the Trust Co. block of 1725 shares *only.* Our clients wish to reserve the John Valentine block of 173 shares. Should you decide to decline our proposition, we have investment securities to offer which you will find highly attractive. It would give us great pleasure to assist you in the investment of your unemployed funds."

Another letter, on July 7, 1903, too long for quotation here, contains the detailed agenda of the defendant's future action. It will be sufficient for the present purposes to quote the following as showing the progress of the defendant's efforts to conceal the true situation and to lull suspicion:

It is absolutely necessary that you should have a good reason for selling and another especially good reason for *selecting me* as a possible customer.

2nd. It is very important that I should have a good reason for *buying.* These various reasons must be based on *plain straight facts* easily put into words for repetition and easy swallowing. A complicated long explanation would be fatal and give rise to suspicions which I wish to avoid.

With success in sight, the necessity for considering means of perpetuating the concealment of the defendant's action forces itself to the fore, and on the same day he writes to his agent: "After this matter is entirely closed, I would like you to send me all the data in your possession connected with the case that you can with propriety send me. Kindly bear this in mind. So far as you are concerned, I rest easy but I would not like any letters, etc., to drift into strangs hands, as others would not understand our reasons for secrecy." It may not be out of place here to anticipate a little, for we find that on Aug. 26, 1903, fear for the future is again expressed in two sentences that almost seem to be prophesy: "Will you kindly arrange, prior to Gold's call on you, to file away *all* of my letters? It would only need one to upset our apple cart; I know you are careful but accidents will happen."

The defendant's project is now not far from success. The stock is almost in his hands; and, on July 9, 1903, we find him writing to Hays in a boastful vein and contemplating the success of what he evidently considers a drama:

Now as a matter of fact I think Gold wants to *coax* a bid out of you and his "fair warning" of his intentions won't blind you a little bit. He will be surprised at the facility with which you turn his guns on him. I think we have him guarded on all points and now I am calmly awaiting the day when I shall send him copies of three letters, and you kindly acknowledge his of the 8th regretting the delay.

*Programme.*
July 10th or 11th—Letter to S. from H.
July 11th—Letter to H. from S.
July 15th or 16th—Wires and L. D. phone.
July 16th—Trip East.
Soon after—Your transfer of points to Silver.
          Your letter to Gold.
     Slow music     ———————————————
     Curtain        ———————————————

By Aug. 7, 1903, everything is practically arranged and there is little to be done but what the defendant calls "the uncovering of the bombshell." On that day he writes to John E. Thomson, Esq., one of his confederates, a letter of considerable length. It is well worth reading, for it contains a resumé of what has been done to date and describes a celebration which the defendant and his self-styled "band" of conspirators held in a remote and secluded place in the country. The conclusion of this letter speaks for itself:

So much for the uncovering of the bombshell, which we will have in a most plausible shape; H's letter is based upon information given him by G himself and my answer is also based on G's information which he gave me. So if G shows these letters to others everybody will say, he, brought it about and drove H to me. Both of these letters are now on file, having been concocted by my confidant, and

are works of art. . . . Now to sum up the business part of this long letter, the dropping out of the option has been successfully accomplished—the stock, fully paid, is safely held in satisfactory shape—the power in my hands to transfer the same at a moment's notice, if need be—the securities necessary to be sold, disposed of at very satisfactory prices—the additional cash safely forwarded—the negotiations for the make believe sale, to me, properly completed, at the auspicious time—plans formulated for the uncovering of the bombshell after the annual meeting—the preparations for severing my connection with W. S. S. & Co. begun—when accomplished, my personal possessions will no longer be at risk in a firm and subject to the dictation of a man who has now *lost his nerve.*

On the afternoon of the day of the business meeting, we all gathered together again at a little shooting club, the lawyers and I belong to, on Cohansey Creek, below Bridgeton, N. J., where we spent the night after a bite of supper and an evening devoted to becoming better acquainted with each other, the only disappointment being that an important member of the band was missing, he being abroad. We missed you. Perhaps next autumn after the bombshell has exploded we come together again and then have the pleasure of your being with us, as I particularly want all the rest of the team to meet you. I call it a *team,* as a more beautiful display of team work I have never seen, each one being indispensable and up to this point, at least, to have acted the part to perfection.

Some may have been before the audience a longer time, but none had a more difficult part nor played it better than did my good friend, John W. Thomson, Esq.

The last letter to Hays hints at the successful effect which the fictitious sale to the defendant by Hays is having upon the trust company and his uncle. It closes this interesting and illuminating correspondence:

Your answer to my telegram arrived just in time. I concluded it was better policy for me to come out flat footed and say yours of the 12th was your second offer. That the first one was a tom-fool affair which I turned down hard only to have you come at me again.

Our interview was very amicable and Gold practically takes the credit for bringing your offer about through his visit and I think he will tell the world this story. The point to overcome now is Gold has asked me to buy Coast's points saying they will meet *any* price. I propose to get their *limit,* in writing, if I can and then have you come on unexpectedly and drive me into a corner where I must either deal or quit. I will deal after you beat Coast's limit by a considerable margin. I propose to demand for Coast's limit on the ground that I will not allow myself to dicker for family holdings and they must decide on a minimum price.

As soon as I get this, I will answer your offer by wire or mail informing you that trade conditions do not warrant the price and that Eddy. points can be had for considerably less. This should be enough to bring you on without your notifying me determined to grab the available market. If I should fail to get them to name a price, they cannot demand that I should make them a bid and I will proceed to work with you, using your stock as a club all the same.

One more thing remains to be done. In spite of all the preparation and all the active and ingenious scheming, Uncle Lincoln Godfrey is indignant. The truth has been kept from him, but his suspicions are aroused and his just resentment is expressed. There is but one way to silence this—a letter must be framed, feigning indignation at his suspicions and calculated to silence them; and so, on Sept. 22, 1903, we find the defendant writing to his "Dear Uncle Lincoln" a letter reeking with falsehood and hypocrisy:

Yours of today received. I am utterly amazed at the reception you accord the announcement of my purchase of Eddystone stock. You say in part "not for the fact that you have gone contrary to the interests of those you were bound to think of, but that you have abused the confidence I placed in you and the reliance I had on your work as to your intent in asking us to offer you the stock."

I absolutely deny having gone contrary to the interests I was bound to think of—or that I have abused any confidence—or that I asked you to offer me any stock.

On the contrary, I have carefully studied the interests of those I was bound to think of and through this very purchase have sought to guard them in the present and future.

I was not aware of any confidence you placed in me and cannot see the necessity for such confidence in a transaction involving a strictly personal investment on my part by which outside holdings, a distinct menace to our concern, have been secured and the question of outside interference disposed of.

I deny absolutely asking you or the Trust Co. to offer me stock and deny any intent in acceding to your request other than to carefully consider the Trust holdings along with my other offer.

You are responsible for suggesting my buying the Trust Co. stock, and in answer to that suggestion I told you I was willing to consider it, with the clear understanding that it was to be a voluntary offer at such a price as they saw fit to impose and that I would not bid or barter for family holdings under any circumstances. You approved my position. You had as a guide my St. Louis offer which I showed you. You made a counter offer inserting a proviso without any previous understanding with me which restricted me from informing Mr. Hays that competition had arisen. Although I considered the proviso unfair, I respected your wishes on this point as I have already informed you, basing my negotiations with Mr. Hays on entirely different grounds and keeping him in ignorance of your offer, which latter was clearly the outcome of his effort to sell me his stock.

In conclusion, I would say I accepted as genuine your expressed hope that I would feel free to buy this stock.

I did not until today interpret this as excluding Mr. Hays's holdings.

By the end of the year, the defendant had supplanted Godfrey in the presidency of the company; the selling agency had been transferred to another, upon what terms we do not know; and the lucrative partnership business was dissolved.

It is unnecessary to review in detail the disclosures of this correspondence; it speaks its own story and characterizes itself. From it may be gathered, however, certain controlling facts in the case, which may be briefly stated. First, the defendant's purpose was to overreach the will of the trustees and to trick them, by fictitious circumstances and by skilfully brought-about situations, into selling what they did not intend or wish to sell, and into believing that the person with whom they were dealing was honorable and in good faith intended to carry out the contract; and, second, that the fraud was facilitated by the confidential relation which the defendant occupied with the trustees and the faith they placed in him. He was dealing with a relative; a fact which, in the case of uncle and nephew, may not be sufficient in itself to give rise to the inference of a confidential relation, but when to this relationship is added the intimate connection of the trust estate with his own and the family fortunes generally, the existence of the confidential relation cannot be doubted. As trustee with his mother, he was the owner of a large block of stock in a company which was almost a strictly family business. He was the vice-president of that company and a director, while his uncle was its president and another of the five directors. He was a partner with Godfrey in the selling agency of the business—its most lucrative end; and he was consulted by the trustees and knew their plans and purposes in advance, as the letters overwhelmingly establish. This required the utmost good faith on his part. The trustees were not dealing here with a stranger at arm's length, notwithstanding they were deceived into so believing. This defendant made himself a spy in his own family, and, fortified with the knowledge that he thus confidentially gained, he accomplished his purpose to thwart their desires and betray their interests. The entire conduct of the defendant in securing the execution of the pretended contract, which was not intended by him to be his contract in truth and in fact, in breaking it and in paying the penalty prescribed, was all part of his carefully laid scheme to trick the plaintiffs into parting with control of the company, which they did not wish, and had definitely refused, to do.

The discovery of this fraud through the plaintiffs' reasonable endeavors to learn who the real purchaser was and his purpose and intentions was frustrated by the defendant's subsequent misrepresentations and fraudulent practices, and by the same active means the fraud was concealed and its success confirmed and perpetuated for upwards of twenty-three years. At the end of this period, however, in November, 1926, a son of Lincoln Godfrey found upon his desk the defendant's private letter-press book, which contained the letters in evidence. Pasted inside the cover of this book appears the following inscription:

From those who appreciate the self-sacrificing devotion of Mr. Lincoln Godfrey, to the interest of the Simpson family. This book was recovered from refuse documents, letters, reports, etc., stored many years ago in an Eddystone warehouse by order of W. P. Simpson. Contents indicate the family may desire to preserve this "voice from the past."

In what manner, or by whom, the book was put on the desk is not known. The defendant had successfully suppressed all other evidence of his wrongdoing; he was safe, save for the book in question; and its fortuitous appearance alone uncovered the fraud and made possible the securing of justice by his victims. There is, therefore, no laches in the case, as contended by the defendant, for the plaintiffs moved with reasonable promptness after the fraud was discovered; and the statute of limitations is also tolled by the defendant's active concealing of his perfidy: Smith *v.* Blachley, 188 Pa. 550; Hughes *v.* Bank, 110 Pa. 428.

The holding by the trustees of Eddystone Manufacturing Company stock, in 1903, amounted, as already stated, to 5140 shares. By the terms of the contract of March 17, 1903, the defendant agreed to buy these shares at $135 per share, in eight instalments, payable on each of the first of the eight months of 1903, beginning with April and ending with November, the first four payments being in the sum of $80,125 each, the next three being $98,350 each, and the last $78,350. The stock deliveries on each of the first four of these payments was to be 575 shares and on each of the last four payments 710 shares.

The plaintiffs delivered, under the contract, the first three of these instalments, aggregating 1725 shares, and received therefor the contract price of $240,375. This included the excess payments amounting to $7500 which it was provided should be retained by the seller in the event of a default by the purchaser. The defendant defaulted upon the fourth payment, which was due July 1, 1903, and the plaintiffs were then left with a holding of 3415 minority shares, deprived of every incident of control, and the $7500 forfeiture referred to. The amount remaining to be paid by defendant to complete the contract, at the contract price of $135 per share, was $453,025.

It is impossible to determine from the evidence with any degree of accuracy the actual value of the 3415 shares of minority stock which remained in plaintiffs' hands after the successful carrying out of the defendant's scheme. From July 1, 1903, to March, 1925, there was no *bona fide* sale of the stock, and the only three sales thereafter were made—one by the defendant of a block of 5000 shares, representing control, to one Bancroft in March, 1925, at $100 per share; and two purchases shortly thereafter, by the same buyer, of blocks of minority stock aggregating 145 shares at $50 per share. None of these sales is of any value as indicating the real worth of the stock at any time. The disparity in the prices between the first and the last two sales renders them useless as standards. In addition, the defendant was the seller

in the first instance, and, in view of his conduct in the case before us, it is impossible to place any reliance upon the results of negotiations carried on by him. Apart from these sales, we have nothing upon which to determine the real value of the stock remaining in the plaintiffs' hands, except that from 1900 to 1903, inclusive, the company lost, from operation, upwards of $370,000, or 37 per cent. of its capital, and from 1903 to 1925 it paid 53½ per cent. in dividends. This would indicate that the shares had some value, but it is utterly inadequate data upon which to base any conclusions.

Turning now to the law applicable to the facts in the case, we find four principal questions for our consideration:

1. Has a court of equity jurisdiction to redress this fraud?

2. Does the defendant's conduct constitute actionable fraud?

3. Have the plaintiffs been guilty of any delay in asserting their rights which would defeat the action under the doctrine of laches or under the statute of limitations?

4. If the foregoing questions are answered in the affirmative, to what remedy are the plaintiffs entitled?

Considering the first of these questions, there is no doubt that equity has jurisdiction of the cause. It is a general proposition that to correct the consequences of fraud equity will intervene (Rigg *v.* Railway Co., 191 Pa. 298, 304; McElhenny's Appeal, 61 Pa. 188, 191, 193; Railway Co. *v.* Walworth, 193 Pa. 207, 214), especially where, by reason of circumstances, the remedy at law is inadequate (Goodwin Co.'s Appeal, 117 Pa. 514, 528); and this is the case at times, even where an adequate remedy might be found at law. "Equity will always entertain jurisdiction to relieve from fraud, notwithstanding that the law will afford relief, either by action or by defense, where such remedy would be doubtful, incomplete or otherwise inadequate. . . . The adequacy of the legal remedy is not presumed and equity will take jurisdiction where it is doubtful or where the court is not satisfied that the plaintiff can be remitted to law without injustice:" 16 Cyc., 83; McElhenny's Appeal, *supra*. The concealment of the fraud in this case for the length of time already indicated; the condition of the company during the intervening years; the change in control, first to the defendant and then to an outside party; the want of adequate data to determine the value of the stock; and the complete absence of any reliable sales, all make the determination of damages, as such, uncertain, difficult and highly speculative, and the remedy at law thus becomes wholly inadequate. In addition, the question of the existence of a remedy at law as a bar to our jurisdiction was not seriously pressed by the defendant at the hearing, notwithstanding a formal objection to the proceedings upon that ground is incorporated in the answer to the bill.

And, finally, the defendant has not made this objection in the manner prescribed by the equity rules. Under Rule 48, a defendant desiring to raise this question must do so by preliminary objection to the bill *in limine*. This rule was adopted in view of section 1 of the Act of June 7, 1907, P. L. 440, which requires a challenge to the jurisdiction of the court upon this ground to be made by demurrer or answer; and Mr. Justice Simpson, in New York & Penna. Co. *v.* New York Central R. R. Co. et al., 280 Pa. 297, said: "That the only allegation as to a lack of jurisdiction is that there was an adequate remedy at law; this does not require consideration, however, since it was waived by not having the objection decided *in limine*, as required by the Act of June 7, 1907, P. L. 440." See, also, Bank of Pittsburgh *v.* Purcell, 286 Pa. 114.

We, therefore, conclude that this court has jurisdiction of the case.

The second question for consideration is whether the defendant's conduct constituted actionable fraud. The defendant contends, first, that because Hays declined to furnish the name of his principal to the plaintiffs, they necessarily dealt with him at arm's length, and there was, therefore, no fraud in the contract itself; and, second, that the forfeiture clause of the contract operates to defeat the plaintiffs' right of action under the general rule that when one stands upon his contract and elects to enforce it, it must be enforced in its entirety, and that the defendant's right to default and to forfeit the excess payments to date must, therefore, be accorded to him.

With neither of these contentions can we agree. The defendant's conduct and his confidential relation to the plaintiffs, as already indicated, take the case out of a situation in which parties are dealing at arm's length. We do not conceive it to be our function, ordinarily, to pass judgment upon the moral obliquity of the parties to a litigation. Where this is disclosed, however, in connection with acts bearing directly upon a charge of fraud, the court may consider the revealed character of a party in passing upon the good faith of his conduct. Viewed in this light, nothing can be said in justification of the defendant's actions. He was dealing with blood relatives and their financial interests. In such dealings, one would expect an observance of at least common rules of honor. Whatever the plaintiffs may have thought of the identity of the person with whom they were dealing, they were deceived into believing he was not one whose association with them in the business in question was close and intimate, whom they naturally trusted, whose judgment they respected, and who was employing his inner knowledge of, and accessibility to, their plans and desires to cheat and overreach them. Such conduct would be dishonorable and actionable if committed between strangers dealing at arm's length; it becomes a gross and indefensible fraud and perfidy in the eyes of equity when committed by one in the position of the defendant.

The case of Williams v. Kerr, 152 Pa. 560, is closely in point upon this subject. There the plaintiff had been the owner of land which the defendant had sought to purchase for manufacturing purposes and which the plaintiff declined to sell. The defendant then procured another to act as his secret agent, and later procured a conveyance by falsely representing that the land was to be used for purposes which would enhance the value of plaintiff's remaining property. Upon discovery of the true facts, the plaintiff brought her bill on the ground of fraud, and, in the trial of that case, just as in the trial of this, the swindler's "shameful mendacity was confessed by himself under oath." The Supreme Court there said that the property "was, by deliberate falsehood, obtained from her (the plaintiff) for persons to whom, and to be used for purposes for which, she would not have sold it upon any terms whatever, because she believed such user would be injurious to her remaining property." In the same case, the court said "it is such injury as will be redressed to obtain from an owner, by a false representation of a fact which he deems material, property which he would not otherwise have parted with upon the terms which he is thus induced to accept."

It is true that in that case the fraud involved, in addition to representations as to the intended use of a part of the plaintiff's property, false assurances as to its effect upon the value of the balance. The underlying principle, however, is the same. There is no difference between such a falsehood and a false representation of an intention to do that without which the seller would not part with his property. In Standard Interlock Elevator Co. v. Wilson, 218 Pa. 280, it is definitely held that false representation of an intention might in itself constitute actionable fraud. "It is true that false statements,

to be deemed fraudulent in law, must relate to something represented as an existing fact, but a statement 'apparently only of intention, purpose or opinion may amount to a statement of fact, as where a person fraudulently misrepresents his intention in doing a particular act to the damage of another.' " The deception here went to the very essence of the transaction, for a material inducement of this sale was the agreement to take all the plaintiffs' stock. The trustees had refused to sell part of their holdings. They were entitled to have a buyer who, in the beginning at least, intended to enter into the same contract that they did—whose mind theirs could meet. This they never had. The contract was a sham and a pretense—an instrument revocable at will by the victim, on discovery of its fraudulent nature, but enforceable to the full limit against its crafty deviser.

The defendant's second contention under this heading—that, if the contract is to be enforced, it must be enforced in its entirety, and that, therefore, his right to default and to forfeit the excess payments to date must be accorded to him, is equally without merit. It may be conceded, as a general principle of law, that a contract which is enforceable must be enforced in its entirety. Where a forfeiture clause, however, is the vital part of a fraudulent scheme— is, indeed, the very weapon the defendant has forged for accomplishing his fraudulent purpose—equity will relieve against the oppressive consequences of its enforcement. It will compel him to do what in conscience he ought to have done, and will not lend itself to the triumph of the defendant's wrong through the operation of law, and inequitable technicalities, and, in doing so, courts of equity justify the purpose of their creation, and the science reaches its highest perfection. The contract which the defendant pretended he was making, and deceived the plaintiffs into believing they were executing, is the contract which the plaintiffs are entitled to have performed—that and no other; and it would be inequitable to allow the defendant to avoid his obvious duty by resort to the very instrument which he concocted for that purpose. We, therefore, conclude that the defendant's conduct constituted actionable fraud, and that the plaintiffs may ignore the fraudulent devise and enforce the equities of their contract.

As to the third question—whether the plaintiffs have been guilty of any delay in asserting their rights which would defeat their action, under the doctrine of laches or under the statute of limitations—we have already stated the circumstances under which the plaintiffs, in November, 1926, discovered the fraud perpetrated upon them. In Hall v. Pennsylvania R. R. Co., 257 Pa. 54, the Supreme Court said: "Where some affirmative act of concealment takes place, it is not material whether the concealment is previous, or subsequent, to the beginning of the cause of action. The question is whether there was a design to prevent the discovery of the facts which gave rise to the action and whether the act operated as a means of concealment." In Dalzell v. Lewis, 252 Pa. 283, this general statement of the doctrine is explained and elaborated and applied in equity, the Supreme Court saying: "Fraud is always concealed. If it was not, no fraud would ever succeed. But when it is accomplished and ended, the rights of the parties are fixed. The right of action is complete. If plaintiff bestirs himself to inquire, he has ample time to investigate and bring his action. If both parties rest on their oars, the statute runs its regular course. But if the wrongdoer adds to his original fraud affirmative efforts to divert or mislead or prevent discovery, then he gives to his original act a continuing character, by virtue of which he deprives it of the protection of the statute until discovery." Precisely this was done in the present case. The many fictitious incidents which the defendant

invented, after the contract was breached, to divert suspicion from himself were all affirmative efforts "to divert or mislead or prevent discovery." There can be no doubt of this, and it, therefore, follows that the plaintiffs have not been guilty of any delay in asserting their rights which would defeat their action.

We come now to the fourth and last question for consideration: What remedy shall be applied? It might be contended that an award in damages, following the law as applicable to actions for deceit, should be applied, were it not evident that the frauds of the defendant have made the fair and accurate ascertainment of damages impossible. We have heretofore pointed out the effect of his conduct upon the ability of the plaintiffs to prove the value of the stock left in their hands with any degree of certainty. Under these circumstances, is there any other remedy which will do exact equity between the parties? We think there is. If the plaintiffs had parted with the 3415 shares of stock left in their hands on July 1, 1903, we would be driven to make the best guess we could from the inadequate information at hand. By good fortune, however, the plaintiffs still have all of the stock in their possession, and we can avoid the futility of attempting an impossible task by compelling the defendant to take the stock and to pay its purchase price under the contract, with interest to date, less proper deductions for the stock's earnings during the interval. By this method we are enabled fully to redress his fraud and to give to him the equivalent of credit on the contract price for its unascertainable value at the time of the breach. This remedy is in the nature of specific performance, but we see no objection to employing it, notwithstanding the ordinary rule that specific performance of contracts relating to personalty will not be granted. It is well settled that "in exceptional cases, where gross fraud or forgery has been practiced to obtain possession of a chattel, equity will decree restitution:" Riggs *v.* Railway Co., 191 Pa. 298, 304. In Rumsey *v.* Railroad Co., 203 Pa. 597, a contract for the sale of stock, which had no ascertainable market value and carried with it a controlling voice in the management of the corporation, was specifically enforced. (See, also, Sherman *v.* Herr, 220 Pa. 421; Northern Central Ry. Co. *v.* Walworth, *supra;* Goodwin Co.'s Appeal, *supra;* 36 Cyc., 560.)

It is true that in these cases it was to the buyer that specific performance was awarded, but we see no reason why the converse of the proposition should not be sound if the damages cannot be fairly ascertained.

Indeed, the objection that specific performance should not be awarded for chattels cannot prevail here, for a further reason which seems to us conclusive. The plaintiffs are not raising the question. They are willing to deliver the stock, and have offered it to the defendant. Reduced, therefore, to its fundamental analysis, the delivery of the stock to the defendant is merely another more accurate, and therefore more equitable, method of setting off, for the benefit of the defendant, the value of the stock against its full purchase price under the contract. If the stock has no value, the amount which the defendant should pay is the full purchase price, with interest; if it has a value, by taking it over, the defendant will receive the full credit to which he is entitled. He cannot, therefore, be injured by taking the stock which he contracted to take and paying its full value, with interest, to the plaintiffs.

The principal sum which the plaintiffs are entitled to receive from the defendant upon the delivery to him of the remaining 3415 shares is made up as follows:

Fidelity-Philadelphia Trust Company et al. v. Simpson.

| | |
|---|---:|
| Purchase price of 5140 shares contracted to be sold, at the contract price of $135 per share............................ | $693,900.00 |
| Credit amount paid by defendant to date of default....... | 240,375.00 |
| | |
| Contract price of stock remaining in plaintiffs' hands, 3415 shares at default.................................... | $453,575.00 |
| To which add 6% interest from July 1, 1903, to Feb. 10, 1928 (24 years, 7 mos., 9 days)....................... | 669,609.66 |
| | $1,123,184.66 |
| Deduct, as credit to defendant, 53½% received by plaintiffs in dividends on the 3415 shares since the breach........ | 182,702.50 |
| | $940,482.16 |

Accordingly, we conclude that the plaintiffs are entitled to a decree directing the payment by the defendant to them of the foregoing sum of $940,482.16, upon delivery to him by the plaintiffs of the said 3415 shares of the stock of the company.

Having reached the conclusions of fact and law above stated, we, therefore, enter the following

*Decree.*

And now, to wit, Feb. 11, 1928, this cause having come on to be heard upon bill, answer and proofs, upon consideration thereof, it is ordered, adjudged and decreed:

1. That the plaintiffs shall deliver to the defendant the 3415 shares of stock of the Eddystone Manufacturing Company, which they agreed to sell and deliver to him under the contract dated March 17, 1903, and which remained in their hands after the breach of said contract by the defendant on July 1, 1903; and

2. That the defendant shall thereupon pay to the plaintiffs the sum of $940,482.16; and

3. That the defendant pay the costs of this proceeding.

The prothonotary will enter this decree *nisi* and give notice of the same to the parties or their counsel, and if no exceptions are filed within ten days thereafter either party may present to the court a form of final decree then to be entered.

Exceptions were filed to the adjudication.

*Owen J. Roberts (George G. Chandler* and *Townsend, Elliott & Munson,* with him), for defendant, exceptant.

*Ellis Ames Ballard* and *Charles I. Thompson,* for plaintiffs, contra.

*Opinion by court in banc on exceptions.*

PER CURIAM, March 14, 1928.—This case is before us upon exceptions to the chancellor's adjudication. We are satisfied, from the evidence presented, that the defendant was guilty of the deceptions and fraudulent practices found by the chancellor, and that the plaintiffs have fully sustained the actionable frauds complained of. Actionable fraud is not confined to direct misstatements of fact. It may lie in the deliberate creation, by subtle devices and deceptions, of misleading appearances, which are calculated and intended to deceive, and which induce a mistaken understanding of the true facts by which alone freedom of judgment and action can exist. In such a case, no direct falsehood may be uttered by the deceiver, no narrowly technical "false pretense" may be committed by him in the dealings between the par-

ties, yet the fraud would be present because of the fraudulent purpose of its perpetrator, his deliberately deceptive and misleading conduct designed to accomplish that purpose, and the successful accomplishment of his fraudulent object. We cannot agree with counsel for the exceptant that the law will confine itself only to the redress of fraud growing out of misstatements of fact. Of course, mere concealment of one's identity as a purchaser is not fraud in law, but where, for the purpose of deceiving the seller as to such identity, the purchaser actively creates a false understanding by a carefully devised set of actions and circumstances—that is, by positive acts creates a deliberate background of false appearances—there is just as much fraud as if actual words were uttered which were misstatements of facts; and this becomes all the more true in a case where, as here, the defendant occupies an intimate, close and confidential relation to the person deceived. When the three enumerated conditions concur—the fraudulent purpose, the action to accomplish it, and the successful result—fraud, in law, exists, whether or not a specific misstatement, immediately connected with the transaction involved, can be pointed out. In the case before us, all of these conditions exist. The fraudulent purpose of the defendant to overreach the will of the trustees and to acquire from them for himself, to whom he knew they would, under no circumstances, sell, a fraction only of their holdings, which he knew they were unwilling to part with, is obvious, and is confessed again and again in his correspondence with his fellow-conspirator, Hays.

The defendant's fraudulent action to accomplish this purpose is the burden of his minute instructions to Hays. Knowing, as he himself declares, that it was essential to the success of his scheme that the trustees should believe that some one other than himself was the purchaser, and that the purchaser intended to buy their entire holdings, he was also aware that if he baldly falsified to them upon these subjects, the pretended contract that he was endeavoring to induce them to sign would be jeopardized, and, if secured, valueless. He, therefore, conceived the idea that he could safely utter the falsehoods indirectly, by cleverly creating circumstances false and deceptive in their implications and appearances, and this method of falsifying he accordingly pursued. A few examples will suffice to illustrate our position. Thus, when his agent, Hays, was negotiating with the trustees for the purchase of the stock, and they were curious as to who Hays's principal was, the defendant caused Hays to write to him a letter, offering to buy his (the defendant's) stock, and this letter he showed to the trustees. Although this "fake" letter had a veritable existence in itself, its exhibition to the trustees, to induce them to believe that the defendant was not the purchaser, was as much a falsehood as would have been a deliberate lie upon the subject. Indeed, it was more potent for success than a bare falsehood, for it tended to lull suspicion and to divert inquiry.

Again, the abandoned attempt by the defendant to buy from the trustees the small parcel of land at Eddystone was another example of this method of falsifying. After offering to buy the land, he wrote to one of the trustees, withdrawing the offer, because he "now realized that we are no longer in a position to settle such matters among ourselves," and saying he did this "in view of the importance of avoiding any possible controversy with the St. Louis people for which I would not like to be responsible." The defendant himself was "the St. Louis people," and the letter was fraudulently deceptive from beginning to end. And, again, in the letter from Hays to the trustees, renewing the negotiations to purchase the stock, after the latter had declined to sell a part only of their holdings, the defendant causes Hays to assert that,

with his "knowledge of the present status of negotiations being conducted by our clients," it is his judgment that, in all probability, his clients will authorize him to accept a proposition in the form that he then suggests, namely, for the purchase of all the stock. Although this is in substance an assertion of the fact that the position of Hays's "clients" had changed, and that they were ready to buy all of the stock, the truth was that no change had occurred and that his "clients" did not intend to buy all the stock and never did so intend.

The foregoing are but a few examples of the many fraudulent acts of the defendant, which are set out at length in the chancellor's adjudication, and we agree with his findings in respect to them.

We are equally clear that the frauds found and enumerated by the chancellor, in connection with the defendant's efforts to conceal his original fraud, toll the statute of limitations and overcome the charge of laches set up by the defendant.

After carefully considering the arguments of counsel on the exceptions, we have reached the conclusion that the basic fraud in the case consisted in the fraudulent procuring by the defendant of the contract with the plaintiffs for the sale of the stock in question; that is, the property which the defendant acquired by his false and fraudulent machinations was the contract itself. The defendant's fraud tainted the whole transaction and gave the plaintiffs a right of action for the damages suffered by them as a result of the fraudulent inducement of the contract. The measure of damages in such a case is determined by ascertaining how much the plaintiffs lost as a result of the fraud—what they lost by the contract which they were induced to execute by the defendant's fraud. This loss was obviously the difference between the value of all of the stock in the hands of the plaintiffs before the fraud was committed and the contract executed and the sum of the amount of money they received under the contract, plus the value of the 3415 shares which were left in their hands after the fraud was committed. The contract itself establishes the value of the entire block of 5410 shares when it was executed. We must assume that the stock was then worth, as an entirety, what the parties agreed it was worth, and the defendant is estopped to assert otherwise. This fixes the value of the plaintiffs' stock, at that time, at $693,900. After the fraud was committed, there remained in the plaintiffs' hands $240,375 in cash (paid by the defendant) and 3415 shares, which were then stripped of all elements of control of the company; and the question now arises as to what was the value of those shares at that time. A careful reading of the testimony satisfies us that there is sufficient evidence to enable us to form a fairly accurate and reliable estimate of this value. It may be conceded that the evidence is not as full and definite as might be desired. This, however, is no reason for our not doing the best we can with the information obtainable: McWilliams v. Altemus, 288 Pa. 277; Eastman Kodak Co. v. Southern Photo Materials Co., 71 Law Ed. Adv. Op. 423. Whatever uncertainty there may be in the conclusion reached, it is due to the fraudulent conduct and concealment of the defendant himself, and he will not be heard to complain that the court does its best with information which his own conduct has rendered meager: Hetzel v. B. & O. Ry. Co., 169 U. S. 26, 37; Eastman Kodak Co. v. Southern Photo Materials Co., supra.

Considering the evidence, therefore, touching upon the value of the stock immediately after the fraud was consummated, we find, first, that for the three years preceding 1903, the company had lost upwards of $370,000; and, second, that for the twenty-two years after 1903, it paid in all 53½ per cent.

in dividends. This is approximately 2.4 per cent. a year, and, if capitalized on the basis of 6 per cent. would fix the value of the stock at about $40 a share. There were no sales of the stock from 1903 to 1925, when, in the latter year, the defendant sold a block of 5000 shares, representing the control, at $100 per share, and, in the same year, there were two sales of minority stock, aggregating 145 shares, to the same purchaser, at $50 a share. While these sales in 1925 are not, of course, controlling, they may be considered for whatever they are worth as throwing light upon the inherent value of the stock, for they would be of help in determining the comparative values of the same stock under the relative conditions that existed at the two periods under consideration. The book value of the stock in 1903 seems to have been about $173 a share, while in 1925 the book value seems to have been about $150. It thus appears that, in 1925, a block of majority stock brought, and, therefore, was probably worth, $100 a share, while, in the same year, minority stock in the same company brought, and was probably worth, only $50 a share. These values were necessarily affected by the fact that for twenty-two years the stock had paid dividends of sufficient size, and with such regularity, as to average about 2.4 per cent. a share. On the other hand, in 1903, and for a number of years previously, the same company had paid no dividends, and, as already stated, had, in the three preceding years, lost upwards of $370,000. It is evident, from these figures, that the book values in the respective years in question are not very persuasive of the true value of the stock. Their disproportion to the few sales that actually occurred questions their worth as standards; and it must not be forgotten that, generally, the market value of stock does not necessarily reflect accurately its book value: Com. *v.* Gimbel, 18 Dauphin Co. Reps. 385; Wood's Estate, 29 Dist. R. 960; Virginia *v.* West Virginia, 238 U. S. 202, 215, 218. Taking all the facts into consideration, we are of opinion that the value of the minority stock remaining in the trustees' hands after the consummation of the defendant's fraud may be fairly and reasonably fixed at $60 per share.

The damages which the plaintiffs have suffered, therefore, are represented by the difference between $693,900 and the sum of $240,375 (the cash received), plus $204,900 (the value of the remaining 3415 shares at $60 per share), or $248,625. To this amount should be added damages suffered by the plaintiffs by reason of the delay in the discovery and redress of the fraud due to the defendant's active and affirmative concealment of it. During this period the plaintiffs would have had the advantage of the use of the $248,625, of which they were deprived by the defendant's fraud; and it may be reasonably assumed that prudent investment and care would have netted them the legal rate of 6 per cent. It is true that interest for the almost twenty-five years, during which the defendant successfully concealed his fraud, amounts to almost one and one-half times the principal sum. Equity will have no hesitancy, however, in awarding such compensation for delay in circumstances like the present, especially as punitive damages might have been asked for and awarded. The defendant has, during all this period, enjoyed the use of the money to which the plaintiffs were entitled, and the flagrant character of his fraud precludes us from awarding to the plaintiffs anything less than full and complete damages. The magnitude of the sum involved cannot be permitted to deter a court of equity from fully and completely righting such a wrong.

The foregoing conclusions as to the measure of damages to be awarded to the plaintiffs may be summarized in the following statement:

Fidelity-Philadelphia Trust Company et al. v. Simpson.

| | |
|---|---|
| Value of 5140 shares in the plaintiffs' hands when contract was induced, at $135 per share............... | $693,900 |
| Amount paid by defendant under the contract.........$240,375 | |
| Value of 3415 shares remaining in plaintiffs' hands at date of default, at $60 per share................... 204,900 | |
| | 445,275 |
| Leaving balance representing damages suffered immediately by plaintiffs as a result of defendant's fraud...........$248,625 | |
| Add 6% int. from July 1, 1903, to March 1, 1928 (24 yrs. 8 mos.) ........................................... 367,965 | |
| Making a total damage due plaintiffs to date of.................$616,590 | |

What is thus being awarded to the plaintiffs is the same damages that they would be entitled to in an action at law for fraud and deceit, as claimed by the plaintiffs in their amended prayer filed at bar. While equity proceedings would not have been necessary to give merely money damages, the jurisdiction of equity was not challenged by the defendant, as pointed out in the adjudication of the chancellor.

We accordingly dismiss the defendant's exceptions Nos. 2 to 26, 29, 31, 36 to 38 and 43 to 57, all inclusive, and sustain exceptions Nos. 1, 27, 28, 30, 32 to 35 and 39 to 42, all inclusive; and now enter the following final decree in the case:

### Decree.

And now, to wit, March 14, 1928, this cause having come on to be heard at this term of court upon bill, answer and proofs, upon consideration thereof, it is ordered and decreed:

1. That the defendant, W. Percy Simpson, pay to the plaintiffs the sum of $616,590; and

2. That the defendant pay the costs of this proceeding.